IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FRANK WASHINGTON, as Trustee of )
the Scott Cemetery,[1] )
 )
　　　Plaintiff, )
 )
　　　v. )　　　　Civil Action No. 1:24-cv-1978 (RDA/IDD)
 )
INTERNATIONAL INVESTMENTS, LLC,)
*et al.*, )
 )
　　　Defendants. )

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Plaintiff Frank Washington's Motion for a Preliminary Injunction (Dkt. 19), Defendant International Investment, LLC's ("ILL") Motion to Dismiss (Dkt. 7), and Defendants Prince William County and Prince William County Board of Supervisors' (collectively, the "County Defendants") Motion to Dismiss (Dkt. 10). The Court heard argument on the Motion for a Preliminary Injunction on July 9, 2025. This Court has dispensed with further oral argument on the Motions to Dismiss as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). These matters have been fully briefed and are now ripe for disposition. Considering the Motion for a Preliminary Injunction and the Motions to Dismiss together with the Second Amended Complaint (Dkt. 1-2), the Memoranda in Support (Dkts. 8, 11, 21), the Oppositions (Dkts. 15, 16, 22), the Replies (Dkts. 17, 18, 23), and oral argument on July 9, 2025, this Court DENIES the Motion for a Preliminary Injunction and GRANTS the Motions to Dismiss.

---

[1] Although the docket reflects that Plaintiff Frank Washington has sued individually and in his capacity as Trustee of the alleged Scott Cemetery; this is incorrect. As the Second Amended Complaint makes clear, Plaintiff has sued only in his capacity as Trustee.

## I.    BACKGROUND

### A.    Factual Allegations in the Second Amended Complaint[2]

Plaintiff has sued in his capacity as Trustee of the alleged Scott Cemetery.  Dkt. 1-2 at 6.[3]

Plaintiff was named as Trustee by the Circuit Court of Prince William County "pursuant to

Virginia Code § 57.24.1." Dkt. 1-2 at 27.[4][5]  Plaintiff alleges that the "Scott Cemetery . . . consists

of certain parcels of land located _on_ unimproved property at 16105 and 16109 John Marshall

Highway, Broad Run, Virginia 20137 (the 'Premises')." _Id._ at 6 (emphasis added).[6]  Plaintiff also

later alleges that the Premises "contain[ed] the Scott Cemetery. _Id._ at 10.

Plaintiff asserts that, according to the so-called "Dovetail Report," which he attaches as an

exhibit to the Second Amended Complaint, the Scott Cemetery has been recognized as a historical

landmark since 1874.  _Id._ at 8.  Exhibit 2 to the Second Amended Complaint consists of an

unsigned Preliminary Information Form for Historic Districts alleged to have been completed by

---

[2] For purposes of considering Defendants' Motions, the Court accepts all plausibly alleged facts within Plaintiff's Second Amended Complaint as true, as it must at the motion-to-dismiss stage. _Ashcroft v. Iqbal_, 556 U.S. 662, 678 (2009); _Bell Atl. Corp. v. Twombly_, 550 U.S. 544, 555 (2007).  For purposes of the Motion for a Preliminary Injunction, the Court looks beyond the allegations of the operative complaint.  Thus, the Court sets those facts out separately.

[3] The Court's references to the Second Amended Complaint refer to the CM/ECF ascribed page numbers rather than the page numbers included on the body of the document.

[4] There is no "Virginia Code § 57.24.1" as referenced in the Order appointing Plaintiff. Dkt. 1-2 at 27.  Instead, the correct code section is Virginia Code § 57-24.1.

[5] Interestingly, Plaintiff, who argues that he lacked notice of the judicial foreclosure sale of the Premises, appears to have failed to inform the state court that the property over which he was seeking to be designated trustee belongs to Defendant ILL. Dkt. 11-1.

[6] Importantly, according to Plaintiff's own allegations the alleged Scott Cemetery was located _on_ the Premises, but the Premises did not consist wholly of the Scott Cemetery.

the Dovetail Cultural Resource Group.  Dkt. 1-2 at 30-53 ("Unsigned Dovetail Report").[7]  The Unsigned Dovetail Report does make reference to the Scott Cemetery, but the information regarding the Scott Cemetery appears to have derived only from Plaintiff and Ronald Turner. Unsigned Dovetail Report, Dkt. 1-2 at 33 (relying on "Frank Washington, personal communication 2021; Turner 2001").  Even so, the Unsigned Dovetail Report indicates that the alleged Scott Cemetery has no grave markers.  *Id.*

In the mid-1990s through early 2000s, Mr. Turner, a local historian, conducted "surveys of *potential* cemeteries through Prince William County" and identified the Scott Cemetery as one such potential cemetery.  *Id.* at 8 (emphasis added).  "[T]he Scott Cemetery was not provided with its own address and geographical parcel identification number at anytime."  *Id.*

In August 2017, Prince William County filed an action to sell the Premises (16105 and 16109 John Marshall Highway) to foreclose on liens filed for failure to pay property taxes.  *Id.* Plaintiff identifies that case as being *Prince William County v. Heather Poindexter, et al.*, CL17006498-00.  *Id.*  That case involved three defendants: Heather Poindexter, Roberta Speight, and Benette Barksdale.  *See Prince William Cnty. v. Poindexter, et al.*, CL17006498-00 (Va. Cir. Ct.).  Plaintiff does not explain how those individuals came to be in possession of the Premises or their relation to the alleged Scott Cemetery.  Plaintiff further asserts that neither he nor any members of the Scott family received any property tax bills or notice of a tax lien; but Plaintiff does not assert why he should have received such notice, how the County should have known to provide notice, or identify any members of the Scott family who he contends should have received notice.  Dkt. 1-2 at 9.

---

[7] When considering a motion to dismiss, the Court can also consider, of course, any attachments to the operative complaint.

In 2020, ILL purchased the premises pursuant to the judicial sale conducted as part of the case the County filed. *Id.* at 10. In October 2020, Plaintiff asserts that ILL later used a boulder and gate to block access to the Premises. *Id.* at 10. In March 2021, ILL bulldozed the surface level of the Premises where it faced John Marshall Highway. *Id.* at 11. ILL did this without proper permitting and was later cited for ground disturbance violations for not having proper permits. *Id.* Plaintiff asserts, upon information and belief, that this clearing resulted in "the loss of grave markers." *Id.*

Plaintiff then informed the Board of the digging and disturbance of the Premises. *Id.* at 12. In May 2021, Plaintiff, ILL, and the Board met to discuss the Premises. *Id.* Together, they then developed a plan regarding excavation. *Id.* Later that month, the Board informed Plaintiff that the Board would not be providing oversight of the excavation of the Premises. *Id.* Plaintiff asserts that at a subsequent meeting in June 2021, the Board assured Plaintiff that there would not be heavy machinery on the Premises. *Id.* at 13.

Plaintiff asserts that an "Archeologist" identified areas of particular interest on the Premises that require additional study. *Id.* (citing report of Matthew "Massaw" Howard – the "Howard Report").[8] It is unclear from the Howard Report what constitute Mr. Howard's qualifications, but he is described as an American Indian Researcher. Dkt. 1-2 at 73. With respect to the Scott Cemetery, Mr. Howard reports that it is "impossible to now identify if there are any burials under the soil." *Id.* at 70. Although Mr. Howard did not give clear geographical markers, it is clear from the organization of the report that the areas of interest identified by Mr. Howard were in relation to other local cemeteries (in particular the Fletcher-Allen Cemetery) and, even there, Mr. Howard recognized that the places in which he was interested (where there were

---

[8] The Howard Report is located at Dkt. 1-2 at pages 64-73.

4

depressions devoid of grass) "may be simply poor soil." *Id.* at 66. On July 1, 2021, Plaintiff learned that a geophysicist had identified some "anomalies" on the premises. Dkt. 1-2 at 13.

On July 4, 2021, ILL held a celebration at the Premises, which included fireworks. *Id.* In August 2021, Plaintiff learned that ILL was excepted from having to obtain permits for digging at the Premises because ILL was now using the Premises for agricultural purposes. *Id.* at 14. In September 2021, Plaintiff learned that ILL had authorized an archeologist to proceed with excavations at the Premises to determine whether any graves exist pursuant to a previously reviewed Scope of Work. *Id.* at 14, 78. In November 2021, Plaintiff observed further excavation at the Premises. *Id.* at 15. Plaintiff was informed that the excavation would be a "slow, careful peel back of layers to look for evidence." *Id.* at 15. Plaintiff later learned that it was ILL's opinion that there was no cemetery on the Premises. *Id.* at 16. In March 2022, ILL continued to dig and excavate at the Premises. *Id.* at 16-17. Plaintiff asserts that ILL intends to use the Premises for a fire pit. *Id.* at 17.

B.    Additional Facts for Purposes of the Preliminary Injunction

Plaintiff's Motion for Preliminary Injunction is directed only at Defendant ILL. Attached to the Motion, Plaintiff included a number of exhibits as well as a declaration, which largely tracks the allegations of his Second Amended Complaint. In Opposition, ILL attached its deeds, an appraisal, a police report, the Ground Penetrating Radar Report (the "GPR Report") (Dkt. 22-6), and the Scott Cemetery Anomaly Truthing Report (the "Truthing Report") (Dkt. 22-7). Plaintiff did not submit any additional documents with his Reply, but two days before the scheduled hearing delivered courtesy copies of fifteen exhibits, some of which were not previously included with his filings. These are denoted as "Plaintiff's Hearing Exhibits."

A review of this additional information reveals that, in 1996 and 2001, Mr. Turner conducted a survey in an "effort to establish the location of know[n] cemeteries and potential cemeteries." Dkt. 22-7 at 18. In so doing, "Turner collected GPS coordinates for over 400 possible cemetery locations, conducted oral history interviews, and recorded cemetery survey results on a standardized cemetery register form." *Id.* at 17. For the alleged Scott Cemetery, Mr. Turner – whose education, training, and qualifications are not provided (and were not discussed during the hearing) – denoted an area 100 yards east of 16111 John Marshal Highway and about 165 feet south of John Marshall Highway. Pl. Hrg. Exh. 1. In any event, according to the Cemetery Registration Form, Mr. Turner classified the cemetery as "Abandoned," noted the condition as "Poor," described the area as about 75 x 35 feet, and noted that any graves would have been "Fieldstone" or "Unmarked." *Id.* Mr. Turner noted "nobody could remember any burials in the last 30-40 years." *Id.* Mr. Turner also estimated that there were approximately 75-100 burials in the alleged Scott Cemetery. Subsequent identifications of the Scott Cemetery appear to rely on the Turner survey. Pl. Hrg. Exhs. 3, 4

Cynthia V. Goode, Ph.D., RPA, and Chales E. Goode, RPA, who produced the Truthing Report, noted that Mr. Turner's estimate of 75-100 burials in the alleged Scott Cemetery is "too large for a 75-by-35-ft cemetery, especially since family burial grounds would not have used rows and plots but rather family groupings without the density and organized spacing of church or municipal cemeteries." Dkt. 22-7 at 18. The Truthing Report also notes various deficiencies in Mr. Turner's survey: (i) missing details, including the physical characteristics of the cemetery and markers; (ii) no mention of any ground depressions or ornamental vegetation; (iii) no dates or surnames; (iv) no discussion of why the cemetery was called the "Scott Cemetery"; (v) no informant names or interview notes; (vi) no background research into deed records, death

6

certificates, church burial records, or other common sources of cemetery related information; and (vii) no cemetery map to depict ground conditions, locations of markers, and associated features. *Id.*

The Truthing Report further notes that the Premises were formerly an agricultural field and a junkyard. *Id.* at 27. It notes that 20 tons of material had been removed from the Premises and that debris still present included "car parts, car trim, tires, modern glass, metal fragments, [etc.]" *Id.*

In September 2021, John P. Mullen, M.A., RPA, conducted ground penetrating radar ("GPR") and electronic magnetic ("EM") investigations of the Premises. Dkt. 22-6 (the "GPR Report"). The GPR Report analyzed an approximately 1-acre area of the Premises on which the Scott Cemetery was alleged to be. *Id.* at 3. The investigation "resulted in the identification of eleven anomalies . . . that may be human burials based on the arrangement and position of the features." *Id.* The EM survey "did not identify any potential cemetery features, nor did it show any correlation with the GPR anomalies." *Id.* The GPR Report recommended that the "soil anomalies identified as possible grave features during the GPR survey should be verified or 'ground-truthed' through archaeological excavation" due to the "possib[ility] of false positives and false negatives." *Id.*

In January 2022, the Truthing Report was prepared. Dkt. 22-7. The Truthing Report indicates that all eleven identified anomalies were investigated and "[n]o grave shaft features were present within the stripped areas around the 11 GPR anomalies." *Id.* at 5. The Report further indicates that "[i]t is likely that the GPR anomalies were false signals generated by concentrations of metal debris from the junkyard that was once located within the project area." *Id.*

In his hearing exhibits, Plaintiff submitted a previously unsubmitted report by Ingrid Howard, P.E., D.GE.  Pl. Hrg. Exh. 7 (the "Geotechnical Opinion").  In the Geotechnical Opinion, Ms. Howard opined that "*potentially* any structures or subsurface materials had already been removed by heavy equipment prior to the archeological geophysical survey."  *Id.* (emphasis added).  The Geotechnical Opinion also purports to rely upon the 1966 USGS Thoroughfare Topography Map, upon which Ms. Howard has indicated "Scott Cemetery" on an unmarked area of the map.  *Id.*

### C.     Testimony at the Hearing

Plaintiff, who has the burden on the Motion for a Preliminary Injunction, presented the testimony of two witnesses at the hearing.  A summary of their testimony is recounted below.

Plaintiff first called Mr. Turner.  Mr. Turner testified that he was on a historical commission in Prince William County in 1996 and was later hired by Prince William County to research potential cemeteries in the County.  Although Mr. Turner indicated that he was very familiar with the history of Prince William County and that he had published several papers on the County, it was unclear what education and training Mr. Turner has that enables him to identify cemeteries. [9]

Mr. Turner testified that, as part of his work for the County, he went to a location off of John Marshall Highway to identify a potential cemetery.  At that time, Mr. Turner testified that he determined that there was a cemetery at that location (locally referred to as the Scott Cemetery) and attempted to get a global positioning system ("GPS") coordinate reading for the location.  He testified that his GPS system was not good.  Mr. Turner indicated that the area he denoted as the Scott Cemetery was not in good condition; it was overgrown.  Nevertheless, Mr. Turner indicated

---

[9] Although Plaintiff's counsel referred to Mr. Turner as an expert at the hearing, he never identified the nature of Mr. Turner's expertise or his education or training and never moved to qualify Mr. Turner as an expert.

that he observed "fieldstones" and depressions in rows, which he visually determined to be graves. Mr. Turner described the fieldstones as common rocks with no markings.

Consistent with the Cemetery Registry Form that he completed, Mr. Turner originally testified that at least 75 graves existed on the area he determined to be the Scott Cemetery. Later, Mr. Turner expressed that he observed at least 30 depressions and fieldstones indicating graves.

Mr. Turner testified that he never researched the history of the land, the cemetery, or the individuals alleged to have been associated with the Scott Cemetery. Rather, he relied on what local persons told him about the property. He indicated that his responsibility was to provide a GPS coordinate location for the potential cemetery, and he did not have a responsibility to identify if, or where, any remains were interred.

On cross-examination, Mr. Turner confirmed that his registry of the Scott Cemetery was based only on his visual inspection of the land, which he observed from an area about ten feet off of a dirt road, and that he does not know how far back the alleged cemetery went. He further confirmed that the area was heavily forested and covered in debris or junk. Mr. Turner stated that he did not do any work to delineate the bounds of the cemetery, that he did not attempt to identify the owner of the property, that he did not attempt to identify the formal address of the property, that he did not do any genealogical research, that he did not review any land records, that he did not review any secondary sources, and that he does not know when the first or last burial in the alleged cemetery took place. Mr. Turner also testified that he did not take any photographs of the depressions and fieldstones that he saw and that he did not keep any records.

When asked about the fieldstones on the property, Mr. Turner indicated that he was not aware whether the stones could have any other purpose or use than as a grave marker. Upon further examination, Mr. Turner conceded that he was aware of another area designated as a potential

cemetery where a similar stone was used as a historical marker of some kind – in other words, not as a grave marker.

Plaintiff, Frank Washington, then testified. Plaintiff testified that his great-great-grandfather owned a large property in the 1800s that included the Premises and also included several cemeteries. Plaintiff indicated that the Premises were sold to James Scott sometime in the 1940s. Plaintiff testified that he has never visited the alleged Scott Cemetery. Plaintiff explained that he became aware of the existence of the Scott Cemetery through his family's oral history. He is not aware of the names of any individuals alleged to be buried in the Scott Cemetery. Plaintiff asserted that he was previously aware that the Premises was heavily wooded but, in 2020, it was cleared by heavy equipment. Plaintiff indicated that, from his perspective, "whatever was there is no longer there." When speaking about the importance of the alleged Scott Cemetery, Plaintiff testified that it was personal to him and personal that the history be protected because all his family had was an oral history. Plaintiff was asked about the alleged location of the Scott Cemetery and answered that it was located on the western side behind the Scott House. On cross-examination, Defense Counsel pointed out that this was contrary to the testimony of Mr. Turner, who identified the cemetery on the eastern side of the premises, of which the Court took judicial notice. Plaintiff testified that his family's graves were "scattered" across his great-great-grandfather's property, but could not testify as to any grave in particular on the Premises.

At the hearing, defense counsel proffered (without objection by Plaintiff) that James Scott purchased the premises in the 1940s and that James Scott is buried in Haymarket, Virginia.

D.    Procedural Background

This case was originally filed in Prince William County Circuit Court in August 2022. Dkt. 1-1. On February 15, 2024, Plaintiff filed an Amended Complaint. Dkt. 1-2 at 1. Defendants

filed a demurrer to the Amended Complaint, which was apparently "overruled and dismissed." *Id.* On October 25, 2025, Plaintiff sought leave to amend his complaint a second time to add an "inverse condemnation" claim, which, for the first time added a claim under the U.S. Constitution. *Id.* at 3.  On November 4, 2024, the state court granted the motion to amend.  Dkt. 1-3.  The Second Amended Complaint contains six counts: (i) a violation of Virginia Code § 57-27.1 against ILL; (ii) a declaratory judgment action against all Defendants; (iii) a violation of Article X of the Virginia Constitution against the County Defendants; (iv) a lack of authority for the sale of the Premises against the County Defendants; (v) an intentional infliction of emotional distress ("IIED") against ILL; and (vi) an inverse condemnation under the Takings Clause of the Fifth Amendment against the County Defendants.  Dkt. 1-2.

On November 5, 2024, the Defendants removed the case to this Court.  Dkt. 1.  On November 25, 2025, all Defendants filed motions to dismiss.  Dkts. 7, 10.  On January 3, 2025, Plaintiff opposed the motions to dismiss.  Dkts. 15, 16.  On January 10, 2025 and January 13, 2025, Defendants filed their replies.  Dkts. 17, 18.

Approximately five months later, on June 2, 2025, Plaintiff filed his Motion for a Preliminary Injunction against ILL.  Dkt. 19.  Plaintiff noticed a hearing for July 9, 2025.  Dkt. 20. On June 16, 2025, Defendant ILL filed its Opposition.  Dkt. 22.  On June 23, 2025, Plaintiff filed his Reply.  Dkt. 23.

On July 7, 2025, two days before the hearing, Plaintiff submitted additional exhibits in a binder to the Clerk's Office.

## II.    LEGAL STANDARDS

### A.    Preliminary Injunction

A motion for a preliminary injunction is subject to the requirements of Federal Rule of Civil Procedure 65. "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Perry v. Judd*, 471 F.. App'x 219, 223 (4th Cir. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way." *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). A grant of preliminary injunctive relief requires the movant to establish the following four factors: (1) the likelihood of irreparable harm to the plaintiff if preliminary relief is denied; (2) the likelihood of harm to the defendants if the preliminary injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Winter*, 555 U.S. at 20.

### B.    Rule 12(b)(6)

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from

the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### III.     ANALYSIS

Because the Motion for a Preliminary Injunctive involves a review of evidence beyond the allegations in the Second Amended Complaint, the Court will first analyze whether Plaintiff is entitled to a Preliminary Injunction. The Court will next analyze whether the Second Amended Complaint should be dismissed.

The Court is sensitive to the perspective of Plaintiff and his supportive community that they believe that there was a cemetery located on the Premises. This belief appears to stem from the report of Mr. Turner (who identified the existence of a cemetery on a purely visual inspection of the area, without the assistance of any tools, research, or confirming information) combined with Plaintiff's recollection of his family's oral history, passed down through generations, that family members' graves were scattered across a larger parcel of land (which included the Premises). Importantly, Defendant ILL appears to have taken Plaintiff's allegations as to the existence of a cemetery on the Premises seriously and investigated those claims. That investigation revealed that depressions identified as possible graves contained only metal, left over from the Premises' prior period as a junkyard. The Court cannot base its determination on speculation, belief, or hearsay passed down through generations. Rather, it is Plaintiff's burden to produce evidence (for purposes of the Motion for a Preliminary Injunction) or plausible allegations (for purposes of the Motions to Dismiss) to support the existence of the alleged Scott Cemetery and

his right to relief.  Because Plaintiff has failed to do either, the Court will deny the Motion for a Preliminary Injunction and grant the Motions to Dismiss.

### A.  Preliminary Injunction

Plaintiff's Motion for a Preliminary Injunction will be denied.  Plaintiff, who fails to connect his Motion to any Count of the Second Amended Complaint, appears unlikely to succeed on the merits of his Second Amended Complaint and has failed to establish irreparable harm or that the balance of the equities weigh in his favor.

### i.  Likelihood of Success on the Merits

Plaintiff appears unlikely to succeed on the merits of his claims for a number of reasons. First and foremost, Plaintiff has failed to put forward plausible evidence that the Scott Cemetery operates as a place where the buried remains of individuals are interred or that Scott Cemetery exists on the disputed Premises.  The GPR Report found only eleven anomalies on the Premises and further investigation determined that they were remnants of the junkyard that was previously housed on the Premises – not evidence of gravesites. Dkts. 22-6, 22-7.  Indeed, all suggestions of the alleged Scott Cemetery appear to relate back to Mr. Turner – who made a purely visual inspection – and Plaintiff himself.  Plaintiff's testimony at the hearing made clear that Plaintiff does not know that there are any graves located on the Premises.  Plaintiff suspects that there are graves on the Premises due to his family's oral history indicating that there were graves "scattered" across a larger property owned by his great grandfather.  With all due respect  to Plaintiff's family history, an oral history that passes through the generations has multiple layers of hearsay contained within it that cannot support Plaintiff's burden here.  Moreover, as Plaintiff's testimony revealed, the oral history relating to the existence of a cemetery does not provide the necessary information

to determine the matters in this case.  Plaintiff testified that he could not identify the name of any individual interred on the Premises nor could he identify the location of any grave.

With respect to the Turner survey, the Truthing Report details all of the difficulties with that report insofar as it identified the alleged Scott Cemetery as a cemetery.  Dkt. 22-7 at 18.  Mr. Turner's testimony made clear that his identification of the cemetery was based only on his visual inspection of depressions and stones and that he undertook no further research to determine whether a cemetery actually existed.   Against the weight of the GPR and Truthing Reports, Plaintiff has only speculation.  *See* Dkt. 1-2 at 70, Howard Report (noting that it is impossible to determine whether there were any graves on the Premises); Pl. Hrg. Exh. 7, Geotechnical Opinion (noting only that evidence of graves may "potentially" have been moved).  As he indicated at the hearing, Plaintiff assumes that whatever was on the Premises is no longer there.  But this reveals the fundamental problem that Plaintiff faces: he has no proof that there were ever remains interred on the Premises.   There is only Plaintiff's unspecific oral history and Mr. Turner's visual observations of what he determined to be depressions and markers.   Indeed, the Cemetery Registration Form completed by Mr. Turner denotes the alleged Scott Cemetery as being "abandoned," in "poor" condition, and with unmarked graves.  Pl. Hrg. Exh. 1.  As Defendant ILL notes, absent the existence of human remains, there is no cemetery pursuant to Virgina Code § 54.1-2310, and Plaintiff has produced no evidence of human remains on the Premises, identified no specific person alleged to be buried there, and produced no records of any person buried there.  Thus, the evidence submitted suggests that no cemetery or graves exist on the Premises.

In his Motion, Plaintiff provides minimal commentary on the likelihood of success on the merits factor, by asserting simply that his allegations and the Turner survey establish the existence of the Scott Cemetery.  Dkt. 21 at 4.  Not so.  Plaintiff does not allege the identity of any person

buried in the Scott Cemetery. Plaintiff does not allege the location of any grave or grave marker. Moreover, Plaintiff does not even identify the location of the Scott Cemetery within the Premises and, at the hearing, appeared to suggest that its location was in a different position from the GPS coordinates marked by Mr. Turner. It is clear from Plaintiff's allegations that Plaintiff views the Scott Cemetery as contained within the Premises but that the alleged cemetery does not encompass the whole of the Premises. Dkt. 1-2 at 6, 10. Indeed, Plaintiff requests that the "bounds of the Scott Cemetery [] be determined by survey." Dkt. 1-2 at 20.

The only real descriptor of the Scott Cemetery is that it encompasses a 75-by-35-foot area, as noted by Mr. Turner. Pl. Hrg. Exh. 1. As the Truthing Report notes, it is unlikely that the 75 graves identified by Mr. Turner could fit within that area. Moreover, Mr. Turner testified that the graves were in neat rows, like one would find in a church cemetery. But this appears to contradict his prior indications, in the Cemetery Registry Form, that this was a family cemetery and that most of the graves were unmarked. Pl. Hrg. Exh. 1. Indeed, as the Truthing Report notes, "family burial grounds would not have used rows and plots but rather family groupings." Dkt. 22-7 at 17. Additionally, the alleged Scott Cemetery does not appear to have the same history as the other surrounding cemeteries. The Unsigned Dovetail Report indicates that the other cemeteries in the area "feature grave markers ranging in date from the 1880s to the 1900s such as rectangular upright headstones (with and without a base), flat markers, slant markers (with and without a base), monuments, and fieldstones" and notes that "[s]ome markers are inscribed." Dkt. 1-2 at 33. The alleged Scott Cemetery appears to stand alone amongst the cemeteries in the area in having no discernable markers. Indeed, as Plaintiff testified, the Potter's Field and Fletcher-Allen cemeteries are still used for burials. And Plaintiff conceded in his testimony that there are records of persons interred in those two cemeteries. But apparently no such records exist for the alleged Scott

Cemetery.  Accordingly, Plaintiff's allegations also do not support the existence of the Scott Cemetery on the Premises, a necessary prerequisite for injunctive relief here.

Because Plaintiff has failed to establish the prerequisite that the Scott Cemetery exists or that it exists on the Premises, the Motion will be denied.  Nevertheless, even assuming that the Scott Cemetery exists as a burial site, an examination of the specific counts of the Second Amended Complaint further demonstrates why injunctive relief is not warranted.  *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (holding that there must be a "sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself," and "[a]bsent that relationship or nexus, the district court lacks authority to grant the relief requested").

There are only three claims asserted against Defendant ILL.  In Count I, Plaintiff alleges a violation of Va. Code Ann. § 57-27.1, which provides for access to cemeteries located on private property.  This statute provides for limited ingress/egress for: (i) family members of persons buried in the cemetery; (ii) plot owners; or (iii) any person engaged in genealogical research.  A plain reading of this statute reveals that Plaintiff lacks standing under that provision because he does not allege that he falls within one of the three categories of persons to whom Section 57-27.1 provides access.  A cemetery trustee is not one of the individuals provided access to a cemetery.  "And the doctrine of *expressio unius est exclusion alterius* instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted was intended to be omitted or excluded."  *Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001).  Moreover, in interpreting this statute, the Virginia Court of Appeals has limited its application to "property *on which a cemetery or graves are actually located*."  *Wintergreen Homestead, LLC v. Pennington*, 76 Va. App. 69, 77 (2022) (emphasis in original).  Plaintiff has also not identified any family

member buried on the Premises.  Thus, here, where Plaintiff has not established that there are graves located on the Premises and where Plaintiff is not explicitly provided a right of access in the statute, Plaintiff is unlikely to succeed on Count I.  Count II is an action for a declaratory judgment, and it likely fails for essentially the same reason – namely, that Plaintiff has not established that the Scott Cemetery exists or that anyone is buried on the Premises.  It also likely fails because the declaration sought does not resolve any rights as between the parties.  Count V is an IIED claim.  Here, Plaintiff has not sued in his personal capacity, but only as a Trustee, and a cemetery cannot suffer emotional distress.[10]  In any event, it is unclear how an IIED claim would provide the injunctive relief that Plaintiff seeks.  Accordingly, Plaintiff is unlikely to succeed on the merits of any of his three claims against Defendant ILL.

ii.      Irreparable Harm

Plaintiff has also failed to demonstrate a likelihood of irreparable harm if an injunction does not issue.  To begin with, Plaintiff has not established that the Scott Cemetery exists on the Premises or that there are human remains there, so Plaintiff has not established that by failing to issue the injunction any graves will be desecrated.  Indeed, the survey upon which Plaintiff primarily relies, indicates that any cemetery that did exist was abandoned and in poor condition at least 20 years ago.  Pl. Hrg. Exh. 1.  This is consistent with the Truthing Report and the testimony from Plaintiff and Mr. Turner regarding the state of the Premises prior to 2020.  Thus, it is not clear that, if the Scott Cemetery exists as a burial site, there is anything undamaged to be preserved.

---

[10] Although litigants appear to generally recognize that claims of emotional distress cannot be asserted on behalf of an inanimate entity (such as a Trust or a cemetery), courts that have addressed claims such as these have rejected them.  *See, e.g.*, *Vittands v. Sudduth*, 49 Mass. App. Ct. 401, 409 (2000) (recognizing that "if the Trust is a true trust, it has no standing to bring the emotional distress claim").

Indeed, at the hearing, Plaintiff testified to his own belief that: "Whatever was there, in my opinion, Your Honor, is no longer there . . . so now it's just a matter of memorializing the area."[11] This again indicates that there may be nothing to preserve and no harm to be prevented by issuing an injunction.

Plaintiff also fails to establish irreparable harm where he cannot establish that any person is buried on the Property. None of the individuals who gave opinions on the Premises – Mr. Turner, Mr. Howard, Ms. Howard, Plaintiff, or the authors of the GPR or Truthing Report – identified any graves on the Premises.[12] Moreover, the GPR and Truthing Reports conducted the very testing that Plaintiff's alleged expert (Mr. Howard) recommended and found no graves. Plaintiff has suggested no further testing that could or should be conducted beyond that detailed in the GPR Report and the Truthing Report. Furthermore, the need for injunctive relief is undermined by the fact that Plaintiff waited to pursue his claims in state court[13] and waited almost six months to file his motion for a preliminary injunction and set the hearing for four weeks after the filing of

---

[11] This belief is also alleged in Plaintiff's Second Amended Complaint: "Based upon information and belief, this clearing and disposing at the Scott Cemetery by the Defendant ILL has resulted in the loss of grave markers." Dkt. 1-2 at 11. But such allegations are not anchored by any facts rendering his belief plausible and, therefore, fail to support his claims or his request for injunctive relief. *See Kashdan v. George Mason Univ.*, 70 F.4th 694, 702 (4th Cir. 2023) (affirming dismissal of claims where allegations were "far too speculative" and "devoid of facts supporting the allegations that were pleaded upon information and belief"); *see also Carter v. Va. Dep't of Game & Inland Fisheries*, 2018 WL 3614975, at *9 (E.D. Va. July 27, 2018) (holding that allegations based upon information and belief "veer away from supporting plausible inferences, and turn instead toward unsupportable conclusory talismanic statements").

[12] Mr. Turner testified that there were graves in the Scott Cemetery, but he also testified that his GPS was not working and that he did not investigate the landowner of the property on which he allegedly viewed those graves. Thus, his testimony is not persuasive as to the existence of any graves on the Premises, especially in light of the GPR and Truthing Reports.

[13] The Original Complaint was filed in 2022, yet the operative complaint was not filed until 2024, and it appears that not much was done in the state court to move the case forward absent the two amendments that Plaintiff undertook. Dkt. 1.

his motion.  *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75 (4th Cir. 1989) (recognizing that "delay is thus quite relevant to balancing the parties' potential harms" and that "a long delay in seeking relief indicates that speedy action is not required").  Moreover, despite the visible debris on the Premises prior to the sale to Defendant ILL, Plaintiff never previously intervened to protect the alleged Scott Cemetery from the accumulation of trash on the site. Plaintiff has identified no person, no grave, and no boundaries for the alleged Scott Cemetery. Additionally, Plaintiff cannot establish irreparable harm based on the speculation that further remediation efforts of Defendant may reveal a grave, because Defendant ILL has affirmatively pledged to comply with the law if a grave is located.  *See Conner v. County of Montgomery*, 2007 WL 1412945, at *1 (W.D. Va. May 10, 2007) (holding "the harm plaintiff alleges is speculative, and speculative harm is not irreparable harm warranting injunctive relief").  Plaintiff's claim of irreparable harm is further undermined by his inexplicable claim for inverse condemnation – for which he expressly seeks monetary damages for the value of the Property.  That Plaintiff seeks monetary relief for the value of the property suggests that there is an adequate remedy at law and that his harms are not irreparable.  Thus, for all these reasons Plaintiff cannot establish irreparable harm.

Plaintiff's reliance on caselaw from other jurisdictions is unavailing.  Plaintiff cites *Bethesda African Cemetery Coalition v. Housing Opportunities Commission*, 489 Md. 1 (2024), for the proposition that there is "no other specific and adequate remedy" for the "repurposing and redevelopment of a burial ground."  Dkt. 21 at 5.  Notably, and unacknowledged by Plaintiff, that citation comes from the dissent.  *See Bethesda Afr. Cemetery Coal.*, 489 Md. at 151 (Hotten, J., dissenting).  The opinion of the Supreme Court of Maryland was that "extraordinary relief in the form of a writ of mandamus is not available."  489 Md. at 59.  Plaintiff's citation to this Court's

decision in *Defend Arlington v. United States*, 2023 WL 8788956 (E.D. Va. Dec. 19, 2023), is likewise unavailing. There, as here, the Court found that there was no likelihood of desecration of graves. Indeed, the Court admonished counsel in that case for failing to be objective in describing the acts of the government as desecration. *Id.* at *8 n.14 ("The Court understands that the references to desecration and destruction of gravesites . . . may be driven by the passions both real and attenuated that Plaintiffs obviously hold regarding the issues, but going forward the Court expects counsel to be objective regarding critical representations."). Finally, in *Bogner v. Villiger*, 343 Ill. App. 3d 264 (Ill. App. 2003), there were apparently "photos, testimony, and [a] record as a whole" supporting the allegation that "defendants' actions desecrated the graves of plaintiffs' ancestors." *Id.* at 271. Such evidence is wholly lacking here. Accordingly, the likelihood of irreparable harm does not weigh in Plaintiff's favor.

### iii.    The Balance of Equities

Plaintiff also fails to establish that the balance of the equities weighs in his favor. Plaintiff asserts that the balance of the equities favor an injunction because the Premises will "ultimately [be] returned to the charge of Mr. Washington." Dkt. 21 at 7. Plaintiff is incorrect.

Plaintiff asserts that the Premises must be returned to him because the County Defendants violated Article X of the Virginia Constitution and that the County Defendants therefore lacked authority to sell the Premises (Counts III and IV). To begin with, courts within this District have routinely rejected "lack of authority" or "wrongful foreclosure" theories. *See Wingate v. Ocwen Loan Servicing, LLC*, 2018 WL 3341186, at *4 (E.D. Va. 2018) (citing cases recognizing that "Virginia law does not recognize a cause of action for 'wrongful foreclosure'").

In any event, the Premises were sold at a judicial foreclosure sale based on an alleged tax delinquency in 2020. That sale was then finalized and the Premises transferred. Plaintiff did not

challenge the sale or the transfer of the Premises, and it is unclear on what basis he could have done so as he has not alleged that he was an owner of the Premises and he had not yet been appointed Trustee of the alleged Scott Cemetery.  Plaintiff essentially seeks an order in this case finding that the state court was without authority to order the sale; this Court cannot do so.[14]  The Supreme Court of Virginia has recognized that "[t]he general rule is that provisions exempting property of individuals or private corporations from taxation must be strictly construed."  *City of Richmond v. Va. United Methodist Homes, Inc.*, 257 Va. 146, 154 (1999).  Here, Plaintiff claims that the Premises were exempt from taxes pursuant to Article X, Section 6 of the Virginia Constitution, which exempts cemeteries from taxation.  Putting to one side that Plaintiff has not established that a cemetery exists on the Premises,[15] the Virginia Constitution only exempts from taxation the "burying grounds or cemeteries" themselves and does not provide for wholesale of any parcel of land on which a cemetery sits.  Va. Const. Art. X § 6(a)(3).  Analyzing prior versions of this exemption, the Supreme Court of Virginia has recognized the limited nature of this exemption and that "[b]y no conceivable device" can a property owner associated with a cemetery

---

[14] There is some question about whether the Court even has jurisdiction to address Plaintiff's claims challenging the judicial sale of the Premises.  Generally, the *Rooker-Feldman* doctrine precludes federal jurisdiction over claims challenging state court decisions.  *See Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 196 (4th Cir. 2002).  But there is some ambiguity regarding whether *Rooker-Feldman* applies to actions removed to federal court.  *Compare Palotai v. Univ. of Md. at College Park*, 38 F. App'x 946, 953 (4th Cir. 2002) (affirming application of *Rooker-Feldman* where case was removed), *with Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194, 198–99 (4th Cir. 2000)) ("Cases invoking the [*Rooker-Feldman*] doctrine involve separate federal court actions, filed in the original jurisdiction of the court, rather than removal of state court actions over which the federal court has, at the time of removal, original jurisdiction.").  Because the parties have not briefed this issue and given that the *Brown* case was a published Fourth Circuit decision, the Court assumes without deciding that it is has jurisdiction to address the merits of Plaintiff's claims.  Ultimately, it does not matter on what basis the Court decides the issue, because the Court is not granting the relief sought by Plaintiff.

[15] And, the taxpayer has the burden of establishing the application of any exemption.  *DKM Richmond Assocs. v. City of Richmond*, 249 Va. 401, 407 (Va. 1995).

"set apart a portion" of its property "to be used for its own benefit and thereby escape taxation." *Commonwealth v. Trs. Evergreen Burial Park*, 176 Va. 9, 14 (1940). Here, there is evidence that the Premises were previously operated as a junkyard and as agricultural property, and Plaintiff has explicitly alleged that the cemetery was only on a portion of the Premises. Applying this Supreme Court of Virginia precedent, the presence of an alleged cemetery on a small portion of the Premises would not exempt the entirety of the Premises from taxation. Indeed, Plaintiff's counsel conceded as much during the hearing, when he acknowledged that all Plaintiff "can do is protect the Scott Cemetery which is a part of the larger whole" and conceded "we're not seeking to protect the larger parcel." Thus, Plaintiff's assertion that the taxes are wholly invalid is unpersuasive, and there would be no basis on which to unwind the judicial foreclosure sale of the Premises.

Moreover, Plaintiff fails to address what gives him standing to challenge the taxes assessed on the Premises. Plaintiff has sued in his capacity as Trustee of the alleged Scott Cemetery. The "Scott Cemetery" was not assessed taxes nor was the Scott Cemetery forced to pay taxes. Rather, as Plaintiff alleges in his Second Amended Complaint, the taxes appear to have been owed by other people. *See Prince William Cnty. v. Poindexter, et al.*, CL17006498-00 (Va. Cir. Ct.). Because Plaintiff does not allege that the "Cemetery" itself was assessed a tax delinquency, Plaintiff lacks standing to challenge the allegedly invalid tax assessments. *See Howell's Motor Freight, Inc. v. Va. Dep't of Taxation*, 1 Va. Cir. 382, at *2 (Oct. 27, 1983) ("That the corporation itself as a party plaintiff has no standing to protest is, of course, obvious as no taxes have been assessed by the state of Virginia against Howell's Motor Freight, Inc."); *cf. Martin v. United States*, 895 F.2d 992 (4th Cir. 1990) (recognizing that the only persons who have standing to challenge a tax assessment are "one[s] against whom the tax was erroneously assessed *or* collected"). Contrary to Plaintiff's argument, Section 57-24.1 does not provide Plaintiff with any special standing.

Rather, it merely provides that a trustee may be appointed for "the purpose of suing or being sued." Va. Code § 57-24.1.[16]

Further, Plaintiff is precluded from seeking to unwind the judicial foreclosure sale by statute. Even assuming that Plaintiff has standing as the Trustee for the alleged Cemetery to challenge the taxes assessed on the Premises (which is far from clear), Plaintiff is barred by the applicable statute of limitations from challenging the tax assessments or the judicial sale. *See* Va. Code § 58.1-3984 (requiring that persons assessed a tax must apply for relief within three years of the last day of the tax year for any such assessment); *see also* Va. Code Ann. § 8.01-113 ("If a sale of a property is made under a decree of a court, and such sale is confirmed, the title of the purchaser shall not be disturbed unless within 12 months from such confirmation the sale is set aside . . . ."). As Virginia courts have recognized, the "twelve (12) month limitation on actions to set aside the sale of property made under decree of the Court does not confine the limitation period to parties involved in that judicial sale or those property served." *Frost Funeral Home, LLC v. Dolinger*, 2017 WL 11449107, at *2 (Va. Cir. Ct. May 31, 2017). Rather, it evinces an intent to "apply to all persons." *Id.* Plaintiff's citation to *Emmanual Worship Center v. City of Petersburg*, 300 Va. 393 (2022), is also unavailing and only serves to confirm the Court's determination here. In *Emmanual Worship Center*, the Supreme Court of Viriginia held that a religious center was precluded from affirmatively seeking to challenge the tax assessments based on the statute of limitations, but recognized that, because the judicial sale in that case had not yet been finalized, the center could challenge the assessments as a defense to the sale. *Id.* at 404 ("EWC would be

---

[16] Plaintiff suggests that he was "appointed by the Court [sic] *to assert the voidness of the sale* of tax-exempt property." Dkt. 16 at 12 (emphasis added). Although that may have been Plaintiff's purpose in seeking appointment, neither the order appointing Plaintiff nor the Motion seeking appointment give any indication that the state court affirmatively endorsed such view. *See* Dkt. 1-2 at 27; Dkt. 11-1.

barred by the three-year statute of limitations from bringing an action against the City to challenge the validity of the assessments . . . . [But] just because EWC can no longer initiate a lawsuit against the City does not mean EWC cannot raise the self-executing tax exemption as a defense to the City's attempt to sell the property in a tax sale").  In that case, the religious center premised its challenge to the tax assessments based on a different tax exemption provision under Article X, but the Supreme Court of Virginia nonetheless held that the center would be barred from raising the challenge affirmatively.  Thus, the *EWC* decision suggests that, to the extent Plaintiff has standing at all, Plaintiff is barred from affirmatively challenging either the tax assessments on or the judicial sale of the Premises because he is well beyond the statute of limitations.

Finally, even assuming that Plaintiff is correct that the judicial sale could be unwound (and it cannot be), Plaintiff provides no basis for why the Premises would convey to him as Trustee rather than reverting to the original owners (apparently, the descendants of James Scott).  The statute providing for Plaintiff to become Trustee only permits Plaintiff to sue or be sued; the statute does not provide Plaintiff with a property interest in the Premises.  *See* Va. Code 57.1-24.1.

For all these reasons the balance of the equities do not weigh in favor of Plaintiff – who has no rights to the Premises – and weigh in favor of Defendant ILL who purchased the Premises at a court ordered sale.

*          *          *

In sum, because the likelihood of success on the merits, the likelihood of irreparable harm, and the balance of the equities do not weigh in favor of Plaintiff, the Motion for a Preliminary Injunction will be denied.

B.     Motions to Dismiss

The Court will address each count of the Second Amended Complaint.  Because this Court finds that Plaintiff has failed to plausibly state a claim upon which relief can be granted, the Second Amended Complaint will be dismissed and the Motions to Dismiss will be granted.

Before turning to the substance of the Motions to Dismiss, however, the Court addresses Plaintiff's arguments that Defendants are precluded from making any motions pursuant to Rule 12 by virtue of their demurrers in state court.  The Court is not persuaded.  Plaintiff relies primarily on Rule 12(g), which provides that "a party that makes a motion *under this rule* must not make another motion under this rule raising a defense or objection that was available to the party."  Dkt. 16 at 7 (emphasis added).  Here, however, Defendants have never made a prior motion pursuant to Rule 12 and, thus, by the plain language of Rule 12(g) it does not apply.  In any event, the Second Amended Complaint is a new pleading and, thus, Defendants are entitled to address the new pleading in a new motion.  Moreover, "courts routinely exercise discretion in applying this rule."  *Aviles-Cervantes v. Outside Unlimited, Inc.*, 276 F. Supp. 3d 480, 487 (D. Md. 2017).  Accordingly, Plaintiff's argument to preclude Defendants' Motions on the basis of Rule 12(g) is denied.

i.     Count I

In Count I, Plaintiff asserts that Defendant has violated Virginia Code § 57-27.1, by preventing ingress and egress from the alleged Scott Cemetery.  Plaintiff's claim here fails on a number of fronts.  First, because Plaintiff has not alleged the location of the alleged Scott Cemetery in relation to the boulder and gates that Defendant ILL added to the Premises, Plaintiff fails to allege facts from which the Court could determine that he (or anyone else) is precluded from accessing the alleged Scott Cemetery.

26

Moreover, as discussed *supra*, this statute provides for limited ingress/egress for: (i) family members of persons buried in the cemetery; (ii) plot owners; or (iii) any person engaged in genealogical research. *See* Va. Code Ann. § 57-27.1. Plaintiff does not allege that he falls within any of those categories and relies on his status as Trustee. Because trustee is not one of the categories explicitly included in the statute, the legislature did not provide a cause of action to Plaintiff. *Reyes-Gaona*, 250 F.3d at 865 (applying the doctrine of *expressio unius est exclusion alterius*).[17] Moreover, in interpreting this statute, the Court of Appeals of Virginia has limited its application to "property *on which a cemetery or graves are actually located*." *Wintergreen Homestead, LLC v. Pennington*, 76 Va. App. 69, 77 (2022). Plaintiff has not alleged to any degree of particularity where specifically the Scott Cemetery is located, and thus Plaintiff cannot establish that the statute applies to the Premises. Accordingly, Plaintiff has failed to state a plausible claim for Count I, and it will be dismissed.

ii.    Count II

In Count II, Plaintiff seeks a declaration that the Scott Cemetery exists as a cemetery under Virginia law and that the bounds of the Scott Cemetery are to be determined by survey. Dkt. 1-2 at 20. Plaintiff further seeks to qualify his declaratory judgment claim as an action to quiet title to the Premises. Dkt. 15 at 10.

It is well settled that the Declaratory Judgment Act, which provides that a court "*may* declare the rights of the parties," creates a discretionary remedy which a court is under no obligation to issue. 28 U.S.C. § 2201(a) (emphasis added). As the Supreme Court has long held,

---

[17] To the extent Plaintiff alleges that he purports to represent the "descendants" of the Scott Family or other persons alleged to be buried in the Scott Cemetery, Plaintiff fails to establish his standing to do so. Plaintiff has made no argument in support of associational standing and the Court sees no basis for such standing. Plaintiff has also not provided any evidence that he has authority to act on behalf of any alleged and unidentified persons.

the Declaratory Judgment Act "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Pub. Serv. Comm'n v. Wycoff Co., Inc.*, 344 U.S. 237, 241 (1952). Indeed, a court's "discretion in deciding whether to declare the rights of litigants" is "substantial" and essentially "unique." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). The Supreme Court has said little to guide courts' wide discretion to grant declaratory relief, holding only that "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness." *Id.* at 287 (quoting *Wycoff Co.*, 344 U.S. at 243). Put another way, if a district court finds, "in the sound exercise of its judgment, . . . that a declaratory judgment will serve no useful purpose," the district court may dismiss. *Id.* at 288.

Plaintiff asserts that the declaration he seeks would "establish[] several rights on Mr. Washington" and would "render the sale of Scott Cemetery from the County Defendants to IILLC void *ab inito*." Dkt. 15 at 8. Not so. To begin with, the declaration that Plaintiff seeks is essentially one that states: "The Scott Cemetery exists at a location to be later determined." *Cf.* Dkt. 1-2 at 20. This declaration serves no useful purpose in this dispute because it would not resolve any current or future legal issues. In the first instance, issuing this declaration would not "declare the rights of litigants." *Wilton*, 515 U.S. at 286. Determining that an entity exists does not determine any rights with respect to that entity. Moreover, because Plaintiff cannot allege, and therefore the Court cannot determine, where the Scott Cemetery (to the extent that it exists) is actually located, the declaration that Plaintiff seeks would not serve any useful purpose. Without a location of the alleged cemetery, there can be no resolution of the disputes between the parties, because such dispute is premised on whether the Scott Cemetery is on the Premises or not. Additionally, to the extent Plaintiff argues that the declaration will unwind the foreclosure sale, judges in this District routinely hold that, where a "sale has already occurred, a declaratory judgment to that effect would

28

be inappropriate." *Harrell v. Caliber Home Loans, Inc.*, 995 F. Supp. 2d 548, 551 (E.D. Va. 2014) (citing cases).  In that regard, a declaratory judgment action serves no useful purpose because "this case involves rights that have already been determined and events that have already taken place." *Pei P'ship Architects, LLP v. Celebrate Va. S., LLC*, 2013 WL 1163463, at *4 (E.D. Va. Mar. 19, 2013).  Here, the taxes were already assessed, and the judicial sale has already taken place.  Thus, issuing a declaration that the Scott Cemetery exists serves no useful purpose and would not resolve any substantial rights as between the parties.

To the extent that Plaintiff seeks a declaratory judgment to quiet title, Plaintiff's claims must also be dismissed, because "Plaintiff[] [has] not alleged any facts that suggest [he has] superior title to the Property." *Harrell*, 995 F. Supp. 2d at 551.  In fact, Plaintiff alleges no basis on which he could gain title to the Premises.  The Virginia Code Section which permits Plaintiff to be named Trustee only does so "for purpose of suit" and does not vest with Plaintiff any property interest.  Virginia Code § 57.1-24.1.  Thus, even if Plaintiff is correct that the Premises were improperly foreclosed upon, the unwinding of the sale would not result in Plaintiff receiving title to the Premises.  Here, again, the declaration Plaintiff seeks would not resolve any of the disputes between the parties to this litigation.

Because the declaration sought would not resolve the rights of the parties to this litigation and serves no useful purpose here, Count II will be dismissed.

### iii.    Counts III and IV

In Count III, Plaintiff alleges a violation of Article X of the Virginia Constitution based on the alleged inability of the County Defendants to tax the Premises.  With respect to Count III, Plaintiff fails to state a claim.  Plaintiff has failed to allege how he has standing, in his capacity as Trustee, to challenge the tax assessments on the Premises.  The taxes would have been assessed

against the prior owners of the Premises, not the Cemetery itself.  The "Scott Cemetery" was not assessed taxes nor was the Scott Cemetery forced to pay taxes.  Rather, as Plaintiff alleges in his Second Amended Complaint, the taxes appear to have been owed by other individuals.  *See Prince William Cnty. v. Poindexter, et al.*, CL17006498-00 (Va. Cir. Ct.).  Because Plaintiff does not allege that the "Cemetery" itself was assessed a tax delinquency, Plaintiff lacks standing to challenge the allegedly invalid tax assessments.  *See Howell's Motor Freight, Inc*, 1 Va. Cir. at *2 ("That the corporation itself as a party plaintiff has no standing to protest is, of course, obvious as no taxes have been assessed by the state of Virginia against Howell's Motor Freight, Inc."); *cf. Martin*, 895 F.2d at 992 (recognizing that the only persons who have standing to challenge a tax assessment are "one[s] against whom the tax was erroneously assessed *or* collected").  Additionally, the Virginia statute pursuant to which Plaintiff was appointed trustee does not provide any special standing but merely permits a trustee to sue or be sued where such standing exists.  Va. Code § 57-24.1.  Because Plaintiff lacks standing to challenge the tax delinquencies owed by other individuals, Plaintiff cannot state a claim for relief pursuant to Article X of the Virginia Constitution.[18]

In Count IV, Plaintiff asserts a claim for "lack of authority" to tax or foreclose on the Premises.  As discussed *supra*, judges within this District uniformly reject "lack of authority" or "wrongful foreclosure" theories.  *See Wingate v. Ocwen Loan Servicing, LLC*, 2018 WL 3341186,

---

[18] As discussed *supra*, even assuming that the Scott Cemetery exists on the Premises, there is significant doubt that the tax delinquencies were unconstitutional given: (i) that, as alleged, the Scott Cemetery covered only a portion of the Premises; and (ii) that tax exemptions are strictly construed.  *See City of Richmond*, 257 Va. at 154 (tax exemption provisions to be strictly construed); *Trs. Evergreen Burial Park*, 176 Va. at 14 (recognizing "[b]y no conceivable device" can a property owner associated with a cemetery "set apart a portion" of its property "to be used for its own benefit and thereby escape taxation").  Indeed, as Plaintiff's counsel conceded at the hearing, "all [Plaintiff] can do is protect the Scott Cemetery Property."

at *4 (E.D. Va. 2018) (citing cases recognizing that "Virginia law does not recognize a cause of action for 'wrongful foreclosure'"). Thus, Count IV will be dismissed.

Counts III and IV are also time-barred, as discussed *supra*. As alleged in the Second Amended Complaint, the Premises were sold at a judicial foreclosure sale based on an alleged tax delinquency in 2020. That sale was then finalized and the Premises transferred. Virginia statutes provide clear limitations on the time period in which challenges to tax assessments and judicial sales can be made. *See* Va. Code § 58.1-3984 (requiring persons assessed a tax must apply for relief within three years of the last day of the tax year for any such assessment); *see also* Va. Code Ann. § 8.01-113 ("If a sale of a property is made under a decree of a court, and such sale is confirmed, the title of the purchaser shall not be disturbed unless within 12 months from such confirmation the sale is set aside . . . ."). As Virginia courts have recognized, the "twelve (12) month limitation on actions to set aside the sale of property made under decree of the Court does not confine the limitation period to parties involved in that judicial sale or those property served." *Frost Funeral Home*, 2017 WL 11449107, at *2. Rather, it evinces an intent to "apply to all persons." *Id.* The Supreme Court of Virginia has held that such limitations periods apply even when a party is challenging a tax assessment on the basis of an exemption in Article X. *See Emmanual Worship Center*, 300 Va. at 404 ("EWC would be barred by the three-year statute of limitations from bringing an action against the City to challenge the validity of the assessments."). Thus, Plaintiff has failed to state plausible claims, and Counts III and IV will also be dismissed on this ground.

iv.    Count V

Count V is an IIED claim. Here, Plaintiff has not sued in his personal capacity, but only as a Trustee, and a cemetery cannot suffer emotional distress. *See, e.g., Vittands v. Sudduth*, 49

Mass. App. Ct. 401, 409 (2000) (recognizing that "if the Trust is a true trust, it has no standing to bring the emotional distress claim"). Moreover, it is clear from the allegations in the Second Amended Complaint that all of the alleged emotional distress was suffered by Plaintiff in his personal capacity. Dkt. 1-2 at 21 ("Plaintiff's emotional distress is a direct and proximate cause of witnessing ILL's deliberate destruction of his family's and his neighbors' family's cemetery."). Because Plaintiff has not sued in his personal capacity, he cannot state a claim for IIED here. Accordingly, Count V will be dismissed.[19]

iv.    Count VI

Plaintiff's final claim is a Takings Clause Claim under the Fifth Amendment of the U.S. Constitution. Plaintiff's claim here suffers a fatal flaw – Plaintiff does not allege that he has ever owned or has any legal interest in the Premises. To state a claim for a violation of a plaintiff's rights under the Takings Clause, a plaintiff must allege facts showing that (1) he has a constitutionally protected property interest, (2) the state took the property for public use, and (3) he did not receive just compensation. *Sparks v. Johnson*, 2009 WL 1918255, at *1 (W.D. Va. June 30, 2009). Here, Plaintiff fails to allege that he has a constitutionally protected property interest. In his capacity as Trustee, Plaintiff was never accorded a property interest in the alleged Scott Cemetery. Va. Code § 57-24.1. Plaintiff asserts that he stands in the shoes of the interested owners

---

[19] Even assuming that Plaintiff brought his IIED claim in his personal capacity, Plaintiff has failed to state a claim where Plaintiff fails to allege a direct relationship to any specific person buried on the Premises whose grave has been disturbed by the actions of Defendant ILL. And, as was made clear at the hearing, Plaintiff cannot make such allegations because Plaintiff does not know of any specific person buried on the Premises, does not know the specific location of the Scott Cemetery, and cannot identify any grave that has been disturbed. Moreover, Plaintiff's allegations make clear that his knowledge of any destruction of graves is speculative. *See* Dkt. 1-2 at 11 (allegations upon information and belief); *see also Kashdan*, 70 F.4th at 702 (allegations were "devoid of facts supporting the allegations that were pleaded upon information and belief").

of the Scott Cemetery, but the statute upon which he relies provides no authority to represent the rights of other persons. Dkt. 1-2 at 22. Nor does Plaintiff reference any other authority that would allow him to represent the interests of other people – individuals whom he does not identify anywhere in the Second Amended Complaint.[20] Nor could the existence of the cemetery create such a property interest, as other provisions of the Virginia Code recognize that a cemetery may exist on private property. *See generally* Va. Code § 57-27.1. As discussed at the hearing, that statute essentially creates an easement in certain categories of persons and, because Plaintiff has identified no family member buried on the Premises, Plaintiff does not fall within those categories of easement holders. Thus, Plaintiff cannot state a Takings Clause claim.

Moreover, to the extent Plaintiff seeks to state an inverse condemnation claim, Plaintiff is beyond the three-year statute of limitations applicable to such claims. Virginia has endorsed the "implied contract theory of inverse condemnation actions," and, pursuant to Va. Code § 8.01-246(4), the statute of limitations for such actions is three years after the cause of action accrued. *Prendergast v. N. Va. Reg'l Park Auth.*, 227 Va. 190, 195 (1984). Here, Plaintiff alleges that the County Defendants were taxing the Premises well before the 2017 filing of a complaint to foreclose on the premises. Dkt. 1-2 at 9. Thus, to the extent Plaintiff has standing at all here, he has failed to state an inverse condemnation claim.

Finally, to the extent that both the Takings Clause theory and the inverse condemnation theory are premised on the Premises being taxed, Plaintiff's claim also fails. It is well-established that taxes "are not themselves a taking." *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 637 (2023). Thus, a government entity has authority to sell a property "to recover the unpaid [] taxes." *Id.* at 639;

---

[20] Permitting a party to purport to represent the interests of other unidentified persons would lead to all sorts of difficulties regarding who is bound by the judgment of the Court, whether such representation is authorized, and other issues.

*see also Richmeade, LP v. City of Richmond*, 267 Va. 598, 602-03 (2004) (recognizing that "[t]aking or damaging property in the constitutional sense means that the governmental action adversely affects the landowner's ability to exercise a right connected to the property"). Thus, because taxes and actions to collect taxes are not takings, Plaintiff cannot state a takings claim or an inverse condemnation claim on the alleged tax delinquencies here. Accordingly, this claim must also be dismissed.

## IV.    CONCLUSION

In sum, for the reasons set forth above, Plaintiff has failed to demonstrate that he is entitled to a preliminary injunction. Plaintiff has not shown a likelihood of success on the merits, a likelihood of irreparable harm, or that the balance of the equities weighs in his favor. Moreover, Plaintiff has failed to plausibly state any claim upon which relief could be granted and the Second Amended Complaint will be dismissed.

Plaintiff has already amended his complaint on two prior occasions. Given the evidence presented with respect to the Motion for a Preliminary Injunction as well as the arguments with respect to the Motions to Dismiss, it appears that permitting further amendment would be futile as Plaintiff does not know the location of the alleged Scott Cemetery and does not know whether any person was buried on the Premises. Thus, Plaintiff will not be permitted to further amend his complaint.

Accordingly, it is hereby ORDERED that Plaintiff's Motion for a Preliminary Injunction (Dkt. 19) is DENIED; and it is

FURTHER ORDERED that Defendant ILL's Motion to Dismiss (Dkt. 7) is GRANTED; and it is

FURTHER ORDERED that the County Defendants' Motion to Dismiss (Dkt. 10) is GRANTED; and it is

FURTHER ORDERED that the Second Amended Complaint (Dkt. 1-2) is DISMISSED.

The Clerk of the Court is DIRECTED to place this matter among the ended causes.

IT IS SO ORDERED.

Alexandria, Virginia
July  11, 2025

_____/s/_____
Rossie D. Alston, Jr.
United States District Judge